IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | REPORT AND RECOMMENDATION |
| Plaintiff, | |
| v. | Case No. 2:06cr565 |
| JOEL CORRAL-ESTRADA, | District Judge Dee Benson |
| Defendant. | Magistrate Judge Paul M. Warner |

This matter was referred to Magistrate Judge Paul M. Warner by District Judge Dee Benson pursuant to 28 U.S.C. § 636(b)(1)(B).  Before the court is Joel Corral-Estrada's (the "driver" or "Corral-Estrada") motion to suppress.[1]  After thorough review and consideration of the testimony presented at the evidentiary hearing and the pleadings submitted by the parties, the court recommends that Corral-Estrada's motion to suppress be denied.

## I. FACTUAL BACKGROUND

### A. Brad Zeeman's Testimony

Brad Zeeman ("Zeeman") is a sergeant with the Utah Highway Patrol ("UHP"), currently assigned to Utah County.  (Official Transcript of May 18, 2007 Evidentiary Hearing on Motion to Suppress (hereafter referred to as "Tr. at ___") at 7.)  Zeeman has been with UHP for eight years and worked for the Utah Department of Corrections for 2½ years prior to joining UHP.

---

[1] *See* docket no. 30.

(Tr. at 7.)

On August 9, 2006, Zeeman had not yet been promoted to sergeant and was working as a road trooper in Juab County.  (Tr. at 8.)  At approximately 1:20 p.m., he was sitting parked in his patrol car near mile marker 218 on Interstate 15 facing southbound.  (Tr. at 8.)  While watching traffic, Zeeman observed a white car traveling northbound.  (Tr. at 8.)  Zeeman believed that the window tinting on some of the vehicle's windows was too dark, in violation of Utah law.  (Tr. at 8-9.)

Zeeman pulled out onto the roadway, caught up with the vehicle, and initiated a traffic stop.  (Tr. at 9.)  He then approached the vehicle on the passenger side.  (Tr. at 9.)  The male driver, the sole occupant, rolled down the passenger side window and demanded to know why he had been stopped.  (Tr. at 9, 11.)  Zeeman considered the driver to be more combative than the average driver who has been stopped.  (Tr. at 9, 10-11.)  Zeeman asked the driver for his driver's license, vehicle registration and insurance information, and then informed the driver that he had been stopped for suspicion of a window tint violation.  (Tr. at 9-10.)  The driver indicated that the tint was legal in New Mexico, which is where the vehicle was registered.  (Tr. at 10.)

Zeeman again told the driver that he suspected the tint was too dark under Utah law and that he would measure the tint.  (Tr. at 10.)  During the conversation about the window tint, the driver did not provide Zeeman with the requested documents.  (Tr. at 11.)  Zeeman again requested the documents, and the driver began looking for the paperwork.  (Tr. at 11.)  Zeeman then engaged the driver in a conversation about the vehicle.  (Tr. at 11.)  The driver told Zeeman that he was coming from Albuquerque and was headed to Salt Lake City.  (Tr. at 11.)  The driver

2

also told Zeeman that the car belonged to his cousin, who had gone to Mexico to visit family, and

that the car had been left for him to use by his cousin during his cousin's absence.  (Tr. at 11.)

      While the driver appeared to be more relaxed during this conversation than he had been

initially, Zeeman noticed that the driver's jaw was still clenched and that his arm muscles

were very tight and stiff.  (Tr. at 11.)  When the driver handed Zeeman the requested paperwork,

his arm quivered. (Tr. at 11-12.)  The driver provided Zeeman with insurance information and

the vehicle registration, which came back registered to an Ishmael Estrada in Albuquerque, New

Mexico.  (Tr. at 12.)  The driver did inform Zeeman that his driver's license had been suspended.

(Tr. at 12.)  Zeeman asked the driver if he had any photo identification, and the driver provided

Zeeman with a Utah identification card.  (Tr. at 13.)  The card was in the name of Joel

Corral-Estrada and contained a photograph that appeared to be a photo of the driver.  (Tr. at 13.)

      Zeeman then asked Corral-Estrada if he had any outstanding warrants.  (Tr. at 13.)

Corral-Estrada told Zeeman he had had a warrant out of Utah County, but had taken care of it,

and he showed Zeeman a copy of the receipt for the paid warrant.  (Tr. at 13.)  Zeeman asked

Corral-Estrada to remain in his vehicle and advised Corral-Estrada that he would return shortly.

(Tr. at 13-14.)

      Zeeman then went back to his patrol car and checked Corral-Estrada's information on the

computer in his car.  (Tr. at 14.)  The vehicle being driven by Corral-Estrada was not listed as

stolen, but Corral-Estrada's driver's license was found to be suspended.  (Tr. at 14.)  The

warrants check also showed that a Joel Corral-Estrada had a warrant out of the Cuyahoga County

Sheriff's Office in Cleveland, Ohio, for dangerous drugs.  (Tr. at 15.)

Zeeman then took steps to verify that the felony warrant out of Ohio was still active.  (Tr. at 16, 25.)  He first contacted the Richfield Dispatch Center and had his dispatcher verify that the warrant was active; the Richfield dispatcher then verified the warrant with Cuyahoga County. (Tr. at 16-17, 25.)   Zeeman was also provided with a description of the Corral-Estrada wanted in the Cuyahoga County warrant, including information that the wanted person had a tattoo on his abdomen.  (Tr. at 17.)  Zeeman did not have any reason to believe that the driver was not the same individual described in the Ohio warrant.  (Id. at 18, 34.)

When the Richfield Dispatch Center confirmed the outstanding felony warrant, the dispatcher requested backup for Zeeman.  (Tr. at 18.)  Knowing he had backup enroute, Zeeman asked Corral-Estrada if he would step out of the vehicle and help measure the window tint.  (Tr. at 18.)  Corral-Estrada got out of the vehicle on the driver's side and walked to the back of the car where  Zeeman was waiting.  (Tr. at 18.)  Zeeman asked Corral-Estrada if he had any weapons, and Corral-Estrada said he did not. (Tr. at 18.)  Zeeman then asked Corral-Estrada to turn around, and Corral-Estrada complied.  (Tr. at 18.)  Zeeman handcuffed Corral-Estrada and told him he was under arrest for driving on a suspended driver's license, a class B misdemeanor. (Tr. at 18-19.)  Zeeman then lifted Corral-Estrada's shirt and verified that Corral-Estrada had a tattoo on his abdomen.  (Tr. at 19.)

Zeeman walked Corral-Estrada to the front of Corral-Estrada's car, off to the side of the road where it was safe.  (Tr. at 19.)  Zeeman had Corral-Estrada remove his shoes so he could check for weapons or contraband and to ensure that Corral-Estrada did not flee.  (Tr. at 19.) Zeeman then measured the window tint on the driver's side window.  (Tr. at 19.)  Zeeman found

4

that the measurement showed a 34% light transmittance, a violation of Utah law.  (Tr. at 19-20.)

Trooper Dustin Livingston ("Livingston") arrived at the scene.  (Tr. at 20.)  Zeeman told Livingston that the driver had been arrested for a warrant out of Ohio and a suspended driver's license.  (Tr. at 20, 38.)  Zeeman asked Livingston to help him conduct a search of the vehicle incident to arrest, as well as an inventory search of the car, which Zeeman was impounding.  (Tr. at 20.)  Zeeman began an inventory of the trunk while Livingston began to search the passenger compartment.  (Tr. at 21.)  As Zeeman was going through the trunk, Livingston came back and showed Zeeman a used methamphetamine pipe that he had found in the center console of the passenger compartment.  (Tr. at 22.)  Zeeman told Livingston to continue his search. (Tr. at 22.)  A short time later, Livingston again came back to the trunk and told Zeeman that he had located a Crown Royal bag containing methamphetamine, secreted away in the center console.  (Tr. at 22.)

Zeeman then went to the passenger compartment where he saw a Crown Royal bag behind a removed portion of the console below the radio and air conditioner controls. (Tr. at 22-23.)  Zeeman pulled out the bag and looked inside where he saw two ziplock bags containing a white crystal substance that he believed to be methamphetamine.  (Tr. at 23.)

### B.  Dustin Livingston's Testimony

Livingston has been working for the Utah Highway Patrol as a trooper for a little more than one year.  (Tr. 48.)  When Livingston arrived at the scene, he began searching the passenger compartment of the car.  (Tr. at 38.)  As he was searching the center console under the arm rest, Livingston noticed that the insert, or bucket, was loose.  (Tr. at 38-39.)  He also noticed tool marks around the edge of the bucket.  (Tr. at 47.)  Livingston lifted up the bucket without using

5

any force.  (Tr. at 40.)  Livingston saw a dirty methamphetamine pipe, a wrapped up Kleenex, a red lighter, and a gum wrapper.  (Tr. at 39-40, 46.)  Livingston removed the items from underneath the center console. (Tr. at 41.)  As he felt the Kleenex, he could tell it contained two more pipes.  (Tr. at 41.)  Inside the gum wrapper, Livingston could see a small twist containing a white crystal substance that, based on his experience, he believed to be methamphetamine.  (Tr. at 41.)  Livingston took a photograph of the center console bucket.  (Tr. at 29.)  Because Livingston took the photograph too close, the photograph does not show the tool marks.  (Tr. 29.)

Livingston then pulled out the ashtray which was just in front of the gear shifter.  (Tr. at 42.)  As he pulled the ashtray out, Livingston noticed that the frame around the ashtray seemed really loose.  (Tr. at 42, 49.)  In Livingston's training and experience, a loose area may indicate a possible hidden compartment.  (Tr. at 42.)  Because he suspected a hidden compartment behind the ashtray, Livingston pried open the gray plastic from the wood frame of the ashtray and looked inside.  (Tr. at 42.)  Livingston did not do any damage to the plastic or wood frame; he pulled the plastic and wood frame apart just enough to see inside.  (Tr. at 51.)  Livingston thought he could see something, but was not sure.  (Tr. at 42.)

After retrieving a flashlight from his patrol car, he then pried open the gray plastic again, and, with the use of the flashlight, he could see what appeared to be a purple bag.  (Tr. at 43.)  Livingston then broke open the wooden frame and retrieved the purple bag.  (Tr. at 43)  When Livingston looked inside the bag, he saw a couple of bags containing a white crystal substance that he believed to be methamphetamine.  (Tr. at 43.)

6

## II. PROCEDURAL HISTORY

Corral-Estrada was indicted on August 16, 2006, and the case was assigned to then-Chief Judge Dee Benson.[2]  On February 28, 2007, Corral-Estrada filed a motion to suppress.[3]  On April 19, 2007, Judge Benson referred the case to Magistrate Judge Paul M. Warner pursuant to 28 U.S.C. § 636(b)(1)(B).[4]

On May 18, 2007, the court held an evidentiary hearing on Corral-Estrada's motion to suppress.[5]  On June 21, 2007, Corral-Estrada filed a memorandum in support of his motion to suppress.[6]  On July 6, 2007, the United States of America (the "government") filed a memorandum in opposition to the motion to suppress.[7]  On July 19, 2007, Corral-Estrada filed a reply memorandum to the government's memorandum in opposition.

## III.  ANALYSIS

Corral-Estrada argues that the evidence in this case should be suppressed because it was seized pursuant to an unlawful search in violation of the Fourth Amendment.  The parties agree that the only issue before the court is whether Livingston's search of the vehicle was permissible as a search incident to arrest.  Accordingly, the court will determine whether this exception to the

---

[2] *See* docket no. 1.

[3] *See* docket no. 30.

[4] *See* docket no. 34.

[5] *See* docket no. 36.

[6] *See* docket no. 39.

[7] *See* docket no. 40.

warrant requirement applies in this matter.

While the Fourth Amendment prohibits unreasonable searches, it is well established that upon "a lawful custodial arrest of the occupant of an automobile," an officer may, "as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." *New York v. Belton*, 453 U.S. 454, 460 (1981). This type of warrantless search is considered valid "because of the need 'to remove any weapons that [the arrestee] might seek to use in order to resist arrest or effect his escape' and the need to prevent the concealment or destruction of evidence." *Id.* at 457 (alteration in original) (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969)). A search incident to arrest, however, "may extend only to the area within the suspect's immediate control, as that is the only area from which the suspect could draw a weapon or damage evidence." *U.S. v. Edwards*, 242 F.3d 928, 937 (10th Cir. 2001). "Thus, if the police arrest the occupant of a car they may also search the passenger compartment of the vehicle, but they may not search other areas that are outside the suspect's immediate control or 'grab' space." *Id.* (quoting *Belton*, 453 U.S. at 460); *see also United States v. Olguin-Rivera*, 168 F.3d 1203, 1205-07 (10th Cir. 1999) (determining that the covered cargo area of an SUV was accessible from inside the vehicle and was thus part of the passenger compartment).

Corral-Estrada asserts that the search was unreasonable as a search incident to arrest because Livingston "dismantled" Corral-Estrada's vehicle by lifting the bucket out of the center console under the arm rest. The court, however, does not agree. In *Belton*, the United States Supreme Court held that officers may "examine the contents of any containers found within the passenger compartment, for if the passenger compartment is within reach of the arrestee, so also

will containers within it be within his reach." *Belton*, 453 U.S. at 461.  The Court defined

"container" as "any object capable of holding another object.  It thus includes closed or open

glove compartments, consoles, or other receptacles located anywhere within the passenger

compartment, as well as luggage, boxes, bags, clothing, and the like."  *Id.* at 461 n.4.

Obviously, the center console itself would be considered a "container" under *Belton*.  *See*

*id.*  While the space beneath the center console insert was not specifically manufactured to be

used for storage, in this case, the center console was modified so that the space beneath it could

be used as a hidden storage compartment.  The tool marks and the looseness of the insert alerted

Livingston that there may be some type of container or receptacle underneath the insert "capable

of holding another object."  *Id.*  Livingston discovered the compartment when he merely lifted

the bucket out of the console, without using force, revealing a storage area where he found

methamphetamine pipes and a twist of suspected methamphetamine.  Accordingly, the court

concludes that, under *Belton*, the space beneath the loose center console bucket was a "container"

within the passenger compartment of the vehicle.  Thus, the search of that area was permissible

as a search incident to arrest.

The court further concludes that the discovery of the contraband under the center console

bucket established probable cause for Livingston to search the entire vehicle, including the area

behind the ashtray.  "Once probable cause to search is established, the officer may search the

entire vehicle, including the trunk and all containers therein that might contain contraband."

*United States v. Bradford*, 423 F.3d 1149, 1160 (10th Cir. 2005) (finding probable cause to

search anywhere in the car where contraband could be found after defendant handed the trooper a

bag of marijuana and pipe from the vehicle).  Because the ashtray was extremely loose and

Livingston had already discovered contraband beneath the center console, Livingston had

probable cause to pry open the plastic molding from the wooden frame of the ashtray as it "might

contain contraband." *Id.*

## IV.  RECOMMENDATION

Based on the foregoing analysis, **IT IS HEREBY RECOMMENDED** that Defendant's

motion to suppress evidence seized during the search of Corral-Estrada's vehicle be **DENIED**.

Copies of the foregoing report and recommendation are being sent to the parties who are

hereby notified of their right to object.  The parties are further notified that they must file any

objections to the report and recommendation, with the clerk of the district court, pursuant to 28

U.S.C. § 636(b), within ten (10) days after receiving it.  Failure to file objections to both factual

and legal conclusions may constitute a waiver of those objections on subsequent appellate

review.

**IT IS SO ORDERED.**

DATED this 15th day of August, 2007.

BY THE COURT:

_____

PAUL M. WARNER
United States Magistrate Judge